**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

Civil Docket Number 1:20-cv-23586
District Judge Robert N. Scola, Jr.
Magistrate Judge Edwin G. Torres

CARROT LOVE, LLC d/b/a
CARROT EXPRESS,

        Plaintiff,

  v.

ASPEN SPECIALTY INSURANCE
COMPANY,

        Defendant.

_____ /

**DECLARATION OF WILLIAM S. BERK IN SUPPORT OF ASPEN SPECIALTY**
**INSURANCE COMPANY'S MOTION TO DISMISS**

I, William S. Berk, hereby declare and state as follows:

1.     I serve as counsel for Defendant Aspen Specialty Insurance Company ("Aspen" or the "Company"). My work address is 2 Alhambra Plaza, Suite 700, Coral Gables, Florida 33134. I make this Declaration in Support of Aspen's Motion to Dismiss (the "Declaration").

2.     I am over the age of 18 and competent to make this Declaration. The statements contained in this Declaration are based on my personal knowledge and a review of the Company's business records, and public records. If called and sworn as a witness, I would and could testify competently to the matters set forth herein.

3.     This Declaration includes Exhibit A through E, combined in an Appendix attached to this Declaration.

4.     On March 17, 2020, Miami-Dade Mayor Carlos Gimenez signed Emergency Order 03-20. A true and correct copy of this order is attached to this Declaration as Exhibit A, at App. 001-004.

5.     On March 20, 2020, Florida Governor Ron DeSantis issued Executive Order Number 20-71. A true and correct copy of this order is attached to this Declaration as Exhibit B, at App. 005-010.

6.      A true and correct copy of *Rose's 1, LLC v. Erie Insurance Exchange,* Order Den. Pls.' Mot. Summ. J. and Granting Def.'s Cross-Mot. Summ. J., No. 2020 CA 002424 B (D.C. Super. Ct. Aug. 6, 2020), is attached to this Declaration as Exhibit C, at App. 011-021.

7.      A true and correct copy of *Social Life Magazine v. Sentinel Insurance Co. Ltd.*, Tr. of Teleconference Order Show Cause, Case No. 1:20-cv-03311 (May 14, 2020), ECF 24-1, is attached to this Declaration as Exhibit D, at App. 022-041.

8.      A true and correct copy of *Gavrilides Management Co. v. Michigan Insurance Co.*, Hr'g Tr. on Mot. Summ. Disposition (July 1, 2020), Case No. 20-258-CB (Mich. Cir. Ct. (Ingham Cty.)), Dkt. No. 24, is attached to this Declaration as Exhibit E, at App. 042-066.

\*      \*      \*

9.      I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

[signature page to follow]

2

DECLARATION OF WILLIAM S. BERK

Executed on September **16**, 2020.

_____

William S. Berk

3

# APPENDIX

# EXHIBIT A

Filed...
HARVEY RUVIN
Clerk, Circuit and County Court
March 17, 2020
at: 10:59 am
By: Sandra Hernandez
Sandra Hernandez
e24037.

CFN  2020R0170779
OR BK 31856 Pgs 1544-1547 (4Pgs)
RECORDED 03/17/2020 11:16:23
HARVEY RUVIN, CLERK OF COURT
MIAMI-DADE COUNTY, FLORIDA



## MIAMI-DADE COUNTY EMERGENCY ORDER 03-20

WHEREAS, Section 252.38(3)(a), Florida Statutes, gives political subdivisions the authority to declare and enact a State of Local Emergency for a period of up to seven days, thereby waiving the procedures and formalities otherwise required of the political subdivision by law; and

WHEREAS, on March 1, 2020, the Governor of Florida issued Executive Order Number 20-51, directing the State Health Officer and Surgeon General to declare a Public Health Emergency due to the discovery of COVID-19/novel Coronavirus in Florida; and

WHEREAS, on March 9, 2020, the Governor of Florida issued Executive Order Number 20-52, declaring a State of Emergency for the state of Florida related to COVID-19/novel Coronavirus; and

WHEREAS, on March 12, 2020, the County Mayor declared a State of Emergency for all of Miami-Dade County; and

WHEREAS, COVID-19/novel Coronavirus poses a health risk to Miami-Dade County residents, particularly elderly residents and those who are immunosuppressed or otherwise have high-risk medical conditions; and

WHEREAS, minimization of contact is necessary to avoid risk of COVID-19 infection for the residents of the County; and

WHEREAS, restaurants, bars, taverns, pubs, night clubs, banquet halls, cocktail lounges, cabarets, breweries, and cafeterias are potential gathering places for the spread of COVID-19/novel Coronavirus; and

WHEREAS, movie theaters, concert houses, auditoriums, playhouses, bowling alleys, arcades, gymnasiums and fitness studios are potential gathering places for the spread of COVID-19/novel Coronavirus; and

WHEREAS, the Federal government is recommending that persons do not participate in gatherings of more than ten people; and

WHEREAS, section 8B-7(2)(f) of the Code of Miami-Dade County authorizes the County Mayor to order the closure of any commercial establishment; and

Miami-Dade County Declaration of Local State of Emergency

WHEREAS, section 8B-7(2)(g) of the Code of Miami-Dade County authorizes the County Mayor to order the closure of any or all bars, taverns, and other business establishments where alcoholic beverages are predominantly sold or otherwise dispensed; and

WHEREAS, sections 8B-7(2)(e) and (o) authorize the County Mayor to limit the movement of persons inside Miami-Dade County in order to safeguard life and health,

THEREFORE, as County Mayor of Miami-Dade County, I hereby order:

1.      All restaurants, bars, taverns, pubs, night clubs, banquet halls, cocktail lounges, cabarets, breweries, cafeterias, and any other alcohol and/or food service business establishment with seating for more than eight people within the incorporated and unincorporated areas of Miami-Dade County shall close on-premises service of customers. Notwithstanding the foregoing, such establishments may operate their kitchens for the purpose of providing delivery services as authorized in paragraph 3 below, and employees, janitorial personnel, contractors, and delivery personnel shall be allowed access to such establishments.

2.      This order shall not apply to grocery stores, pharmacies, gas stations, and convenience stores, except that those discrete portions of such establishments that provide alcohol and/or food service with seating for more than eight people shall abide by the restrictions in paragraph 1.

3.      This order shall not apply to delivery services, pick-up, or take out services provided by any of the establishments listed in paragraph 1 or 2.

4.      This order shall not apply to restaurants that are ancillary to essential services, including the airports, PortMiami, secure facilities, and hospitals. Other essential services may be determined by the County Mayor from time to time and filed with the Clerk of the Board.

5.      All movie theaters, concert houses, auditoriums, playhouses, bowling alleys, arcades, gymnasiums and fitness studios shall close.  This order shall not apply to gymnasiums or fitness centers which are: (i) amenities of hotels and which have a capacity of 10 persons or less, (ii) are an amenity of a residential building, (iii) are interior to any fire or police stations, or (iv) are located inside any single-occupant office building.

6.      The provisions of this order shall serve as minimum standards.  Municipalities may impose more stringent standards within their jurisdictions.

7.      This order shall expire upon the expiration of the existing Miami-Dade County State of Local Emergency, except that if such State of Local Emergency is extended, this order shall also be deemed to extend for the duration of such extension.  This order may be cancelled earlier by action of the County Mayor.

8.      This order shall be effective as of 11 p.m., March 17, 2020.

9.      This order shall be provided to all appropriate media consistent with the requirements of section 8B-7(2)(n) of the Code of Miami-Dade County.

**APP 003**

## Miami-Dade County Declaration of Local State of Emergency

10.    This order cancels, supersedes, and replaces Miami-Dade County Emergency Order 2-20.

Enacted:
Signed:_____
              **COUNTY MAYOR**

           Date: 3/12/2020        Time: 10:20

           Witness:

Cancelled:
Signed:_____
              **COUNTY MAYOR**

           Date: 5/31/2020       Time: 15:01

           Witness:

EO 03-20

**APP 004**

# EXHIBIT B

APP 005

# STATE OF FLORIDA

## OFFICE OF THE GOVERNOR
## EXECUTIVE ORDER NUMBER 20-71

(Emergency Management - COVID-19 – Alcohol Sales, Restaurants, and Gyms)

**WHEREAS**, on March 1, 2020, I issued Executive Order 20-51 directing the Florida Department of Health to issue a Public Health Emergency; and

**WHEREAS**, on March 1, 2020, the State Surgeon General and State Health Officer declared a Public Health Emergency exists in the State of Florida as a result of COVID-19; and

**WHEREAS**, on March 9, 2020, I issued Executive Order 20-52 declaring a state of emergency for the entire State of Florida as a result of COVID-19; and

**WHEREAS**, on March 16, 2020, President Donald J. Trump and the Centers for Disease Control and Prevention ("CDC") issued the "15 Days to Slow the Spread" guidance advising individuals to adopt far-reaching social distancing measures, such as avoiding gatherings of more than 10 people, and in states with evidence of community spread, bars, restaurants, food courts, gyms and other indoor and outdoor venues where groups of people congregate should be closed; and

**WHEREAS,** the State Surgeon General has advised me that gyms and fitness centers are establishments that attract gatherings of more than 10 people and are more susceptible for spreading COVID-19; and

**WHEREAS**, on March 17, 2020, I issued Executive Order 20-68 restricting bars, pubs, and nightclubs from selling alcohol and ordered every restaurant to limit its occupancy to 50% of its current building occupancy and abide by the CDC's "social distancing" guidelines; and

1

**APP 006**

**WHEREAS**, restaurants are increasing sales of orders for take-out and delivery for customers in order to meet demand while adhering to Executive Order 20-68; and

**WHEREAS**, I am committed to supporting retailers, restaurants and their employees as they pursue creative business practices that safely serve consumers during this temporary period of social distancing; and

**WHEREAS**, as Governor, I am responsible for meeting the dangers presented to this state and its people by this emergency.

**NOW, THEREFORE, I, RON DESANTIS**, as Governor of Florida, by virtue of the authority vested in me by Article IV, Section (1)(a) of the Florida Constitution, Chapter 252, Florida Statutes, and all other applicable laws, promulgate the following Executive Order to take immediate effect:

Section 1.     Alcohol Sales

A.  I hereby order all vendors licensed to sell alcoholic beverages for consumption on the premises to suspend the sale of alcoholic beverages by the drink or in sealed containers for consumption on the premises. Such vendors may continue to sell alcoholic beverages in sealed containers for consumption off-premises.

B.  The restriction in section 561.20(2)(a)4., Florida Statutes, prohibiting a specially licensed food service establishment from selling package sales of alcohol for delivery, take-out or consumption off-premises is suspended for restaurants complying with Executive Order 20-68, through the expiration of the state of emergency declared in Executive Order 20-52, including any extensions, so long as the following conditions are met:

1)  Any sale of an alcoholic beverage in a sealed container for consumption off-premises is accompanied by the sale of food within the same order; and

2

2)  Any delivery of an alcoholic beverage complies with section 561.57, Florida Statutes.

C.  The provisions of section 561.42, Florida Statutes, and Rules 61A-1.010, 61A-1.0107, 61A-1.0108, Florida Administrative Code, are suspended for the limited purpose of allowing licensed vendors of alcoholic beverages to request the return of undamaged alcoholic beverages purchased for events cancelled in response to COVID-19, so long as:

1)  The requests are made within 30 days of the expiration of the state of emergency declared in Executive Order 20-52, including any extensions.

2)  Vendors shall make and keep records of all events cancelled in response to COVID-19 that comply with section 561.55, Florida Statutes, and Rule 61A-1.01028(2), Florida Administrative code, and also include:

    a.   the event name;

    b.   the date the event was to be held;

    c.   the date the event was cancelled;

    d.   the location of the event or gathering that was cancelled; and

    e.   the product returned to a distributor as a result of the cancellation of the event.

3)  Licensed distributors shall make and keep records of all returns that comply with the record keeping requirements of section 561.55, Florida Statutes, and Rule 61A-1.01028(2), Florida Administrative code, and also include:

    a.   the request from the licensed vendors;

    b.    the date the request was made;

    c.   the identity of the licensed vendor making the request, including the

3

licensed vendor's business name and address;

d.  the license number of the licensed vendor making the request;

e.  the product returned; and

f.  whether the vendor received cash or credit.

4)  Vendors receive cash or a credit against outstanding indebtedness within sixty days from the date the distributor picks up the products.

5)  The returned products were not initially purchased, sold, or otherwise obtained with either the privilege of return, or in any other manner that would be considered a violation of Florida's Beverage Law.

D.  This Section does not prohibit retail stores and vendors that currently sell sealed containers of alcoholic beverages for off-premises consumption from continuing such sales for off premises consumption.

E.  This Section amends and supersedes Executive Order 20-68, Section 1.

Section 2.        Restaurants and Bars

I hereby order all restaurants and food establishments licensed under Chapters 500 and 509, Florida Statues, within the State of Florida to suspend on-premises food consumption for customers. Notwithstanding the foregoing, such establishments may operate their kitchens for the purpose of providing delivery or take-out services. Employees, janitorial personnel, contractors and delivery personnel shall be allowed access to such establishments for the purposes of delivery or take-out services. This Section amends and supersedes Executive Order 20-68, Sections 3(A)-(B).

Section 3.        Gyms and Fitness Centers

I hereby order the closure of gymnasiums and fitness centers within the State of Florida.

4

This order shall not apply to gymnasiums and fitness centers which are: (i) amenities of hotels which have a capacity of 10 persons or less, (ii) are an amenity of a residential building, (iii) are interior to any fire or police stations or (iv) are located inside any single-occupant office building.

Section 4.    Enforcement and Implementation

A.  The Department of Business and Professional Regulation shall utilize its authorities under Florida law to further implement and enforce the provisions of this Executive Order and shall take additional measures as necessary to protect the public health, safety and welfare.

B.  Pursuant to section 252.36(6), Florida Statutes, all state and local law enforcement shall further implement and enforce the provisions of this Executive Order.

Section 5.    This Executive Order shall expire upon the expiration of Executive Order 20-52, including any extensions.

IN TESTIMONY WHEREOF, I have hereunto set my hand and caused the Great Seal of the State of Florida to be affixed, at Tallahassee, this 20th day of March, 2020.



RON DESANTIS, GOVERNOR

ATTEST:

SECRETARY OF STATE

2020 MAR 20  PM 1: 22

FILED

5

**APP 010**

# EXHIBIT C

APP 011

**SUPERIOR COURT OF THE DISTRICT OF COLUMBIA**
**CIVIL DIVISION—CIVIL ACTIONS BRANCH**

| | | |
|---|---|---|
| **ROSE'S 1, LLC, et al.,** | * | |
| | * | |
| **Plaintiffs,** | * | Civil Case No. 2020 CA 002424 B |
| | * | Civil II, Calendar I |
| **v.** | * | Judge Kelly A. Higashi |
| | * | |
| **ERIE INSURANCE EXCHANGE,** | * | |
| | * | |
| **Defendant.** | * | |

**ORDER DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND**
**GRANTING DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT**

This matter comes before the Court on Plaintiffs' Motion for Summary Judgment ("Plaintiffs' Motion") and Defendant's Cross-Motion for Summary Judgment ("Defendant's Motion"). While the Court is sympathetic to the plight of Plaintiffs, it must grant summary judgment to Defendant as a matter of law.

## I.      FACTS

Plaintiffs own and operate a number of prominent restaurants in the District of Columbia. They all purchased "Ultrapack Plus Commercial Property Coverage" from Defendant Erie Insurance Exchange. Included in this policy is coverage for "loss of 'income' and/or 'rental income'" sustained "due to partial or total 'interruption of business' resulting directly from 'loss or damage'" to the property insured. Rose's 1 Ultrapack Plus Commercial Property Coverage ("Coverage") at 3. The coverage document further states that the "policy insures against direct physical 'loss'" with the exception of several exclusions that are not relevant to this matter. *Id.* at 4.

This case comes in the context of the COVID-19 pandemic. COVID-19 is "a novel severe acute respiratory illness that has killed … more than 100,000 nationwide. At this time, there is no known cure, no effective treatment, and no vaccine. Because people may be

infected but asymptomatic, they may unwittingly infect others." *South Bay United Pentecostal Church v. Newsom*, 140 S. Ct. 1613 (2020) (Roberts, C.J., concurring).  On March 11, 2020, D.C. Mayor Muriel Bowser declared a state of emergency and a public health emergency due to the "imminent hazard of or actual occurrence of widespread exposure" to COVID-19.  Plaintiffs' Statement of Material Facts ("SMF") ¶3.  On March 16, Mayor Bowser issued an order prohibiting table seating at restaurants and bars in D.C.  SMF ¶4.  On March 20, Mayor Bowser extended this ban to "standing customers at restaurants, bars, taverns, and multi-purpose facilities."  SMF ¶5.  On March 24, Mayor Bowser ordered the closure of all non-essential businesses.  SMF ¶6.  On March 30, she ordered all D.C. residents to stay in their residences except for limited "essential" reasons, a restriction that continued for several months.  SMF ¶¶7-8.

As a result of Mayor Bowser's orders, the restaurant Plaintiffs were forced to close their businesses and suffered serious revenue losses.  SMF ¶¶21-22.  To cover those losses, they filed insurance claims with Defendant pursuant to insurance policies that "are substantively identical in all ways relevant to this action."  SMF ¶78.  When Defendant denied their claims, Plaintiffs filed this lawsuit seeking a declaratory judgment that their claims were covered by the express language of their insurance contracts with Defendant.  Both sides subsequently moved for summary judgment.

## II.    SUMMARY JUDGMENT STANDARD

D.C. Superior Court Rule of Civil Procedure 56 allows a court to grant summary judgment to a party when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  D.C. Super. Ct. Civ. R. 56(a); *Perkins v. District of Columbia*, 146 A.3d 80, 84 (D.C. 2016).  In considering a motion for summary judgment, the

APP 013

court must view the evidence "in the light most favorable to the nonmoving party, who is entitled to all favorable inferences which may reasonably be drawn from the evidentiary materials." *Phelan v. City of Mt. Rainier*, 805 A.2d 930, 936 (D.C. 2002) (internal quotation marks omitted). The Court "may not resolve issues of fact or weigh evidence at the summary judgment stage." *Fry v. Diamond Construction, Inc.*, 659 A.2d 241, 245 (D.C. 1995) (internal quotation marks omitted). Even if no material dispute of fact exists, the moving party must still establish that it is entitled to judgment as a matter of law. D.C. Super. Ct. Civ. R. 56(a).

## III.    ANALYSIS

Under District of Columbia law, "[c]ontract principles are applicable to the interpretation of an insurance policy." *Carlyle Inv. Mgmt. LLC v. Ace Am. Ins. Co.*, 131 A.3d 886, 894 (D.C. 2016). "The proper interpretation" of an insurance contract, "including whether [the] contract is ambiguous, is a legal question." *Id.* (internal quotation mark omitted) (quoting *Tillery v. D.C. Contract Appeals Bd.*, 912 A.2d 1169, 1176 (D.C. 2006)). "[A]n insurance policy is to be . . . enforced in accordance with the real intent of the parties as expressed in the language employed in the policy." *Redmond v. State Farm Ins. Co.*, 728 A.2d 1202, 1205 (D.C. 1999) (internal quotation marks omitted) (quoting *Peerless Ins. Co. v. Gonzalez*, 697 A.2d 680, 682 (Conn. 1997)). A court must "give the words used in an insurance contract their common, ordinary, and . . . popular meaning," *Id.* (omission in original) (internal quotation marks omitted) (quoting *Quadrangle Dev. Corp. v. Hartford Ins. Co.*, 645 A.2d 1074, 1075 (D.C. 1994)), and must interpret the contract "as a whole, giving reasonable, lawful, and effective meaning to all its terms, and ascertaining the meaning in light of all the circumstances surrounding the parties at the time the contract was made," *Carlyle Inv. Mgmt.*, 131 A.3d at 895 (internal quotation mark omitted) (quoting *Debnam v. Crane Co.*, 976 A.2d 193, 197 (D.C. 2009)).

3

"[I]f the provisions of the contract are ambiguous, the correct interpretation becomes a question for a factfinder." *Carlyle Inv. Mgmt.*, 131 A.3d 886 at 895 (internal quotation marks omitted) (quoting *Debnam*, 976 A.2d at 197-98).   "Where," however, "insurance contract language is not ambiguous, summary judgment is appropriate because a written contract duly signed and executed speaks for itself and binds the parties without the necessity of extrinsic evidence."  *Fogg v. Fidelity Nat. Title Ins. Co.*, 89 A.3d 510, 514 (D.C. 2014) (internal quotation marks omitted) (quoting *Stevens v. United Gen. Title Ins. Co.*, 801 A.2d 61, 66 (D.C. 2002)).  Indeed, the Court "should not seek out ambiguity where none exists."  *Athridge v. Aetna Cas. & Sur. Co.*, 351 F.3d 1166, 1172 (D.C. Cir. 2003) (citing *Medical Serv. of Dist. of Columbia v. Llewellyn*, 208 A.2d 734, 736 (D.C. 1965)).

At the most basic level, the parties dispute whether the closure of the restaurants due to Mayor Bowser's orders constituted a "direct physical loss" under the policy.  Plaintiffs start with dictionary definitions to support their case.  For example, they cite the American Heritage Dictionary definition of "direct" as "[w]ithout intervening persons, conditions, or agencies; immediate."  Plaintiffs' Motion at 9-10.  They also cite the Oxford English Dictionary definition of "physical" as pertaining to things "[o]f or pertaining to matter, or the world as perceived by the senses; material as [opposed] to mental or spiritual."  *Id*. at 10.  As for "loss," it is defined by the coverage document as "direct and accidental loss of or damage to covered property."  Coverage at 36.

Plaintiffs use these definitions to make three primary arguments.  *First*, Plaintiffs argue that the loss of use of their restaurant properties was "direct" because the closures were the direct result of the mayor's orders without intervening action.  Plaintiffs' Motion at 9-10.  But those orders were governmental edicts that commanded individuals and businesses to take certain

4

actions.  Standing alone and absent intervening actions by individuals and businesses, the orders did not effect any direct changes to the properties.

*Second*, Plaintiffs argue that their losses were "physical" because the COVID-19 virus is "material" and "tangible," and because the harm they experienced was caused by the mayor's orders rather than "some abstract mental phenomenon such as irrational fear causing diners to refrain from eating out."  Plaintiffs' Motion at 11.  But Plaintiffs offer no evidence that COVID-19 was actually present on their insured properties at the time they were forced to close.  And the mayor's orders did not have any effect on the material or tangible structure of the insured properties.

*Third*, Plaintiffs argue that by defining "loss" in the policy as encompassing either "loss" or "damage," Defendant must treat the term "loss" as distinct from "damage," which connotes physical damage to the property.  Plaintiffs' Motion at 11-12.  In contrast, Plaintiffs argue, "loss" incorporates "loss of use," which only requires that Plaintiffs be deprived of the use of their properties, not that the properties suffer physical damage.  *Id*. at 12-13.  But under a natural reading of the term "direct physical loss," the words "direct" and "physical" modify the word "loss."  As such, pursuant to Plaintiffs' dictionary definitions, any "loss of use" must be caused, without the intervention of other persons or conditions, by something pertaining to matter—in other words, a direct physical intrusion on to the insured property.  Mayor Bowser's orders were not such a direct physical intrusion.

Further, none of the cases cited by Plaintiffs stand for the proposition that a governmental edict, standing alone, constitutes a direct physical loss under an insurance policy.  In *Gregory Packaging, Inc. v.  Travelers Property Casualty Co. of America*, the court found that the release of ammonia into a juice cup packaging factory was a "direct physical loss" because it constituted

APP 016

"an actual change in insured property then in a satisfactory state, occasioned by accident or other fortuitous event *directly upon the property* causing it to become unsatisfactory for future use or requiring that repairs be made to make it so."  2014 U.S. Dist. LEXIS 165232 at *13-19 (D.N.J. Nov. 25, 2014) (quoting *AFLAC Inc. v. Chubb & Sons, Inc.*, 260 Ga. App. 306, 319-20 (Ga. Ct. App. 2003)) (internal quotation marks omitted) (emphasis added).  Similarly, in *Western Fire Insurance Co. v. First Presbyterian Church*, the Colorado Supreme Court found a "direct physical loss" when gasoline fumes from an unknown source entered an insured church and the fire department ordered the church's closure.  437 P.2d 52, 55 (Colo. 1968).  The court based its reasoning on the fact that the church "became so infiltrated and saturated as to be uninhabitable, making further use of the building highly dangerous." *Id.*  At the same time, the Court noted that "[i]t is perhaps quite true" that the fire department's closure order, "*standing alone*, does not in and of itself constitute a 'direct physical loss.'" *Id*. (emphasis added).  All of the other cases cited by Defendant involved some compromise to the physical integrity of the insured property. *See Port Authority v. Affiliated FM Insurance Co.*, 311 F.3d 226, 236 (3d Cir. 2002) (presence of asbestos in building was not "physical loss" because building owner could not show real or imminent "contamination of the property such that its function is nearly eliminated or destroyed, or the structure is made useless or uninhabitable"); *Motorists Mut. Ins. Co. v. Hardinger*, 131 Fed. Appx. 823, 826-27 (3d Cir. 2005) (presence of bacterium on property could constitute "direct physical loss" if it "reduced the use of the property to a substantial degree"); *TRAVCO Insurance Co. v. Ward*, 715 F. Supp. 2d 699, 709-10 (E.D. Va. 2010), *aff'd* 504 F. Appx. 251 (4th Cir. 2013) (home rendered uninhabitable by toxic gases released by defective drywall constituted "direct physical loss"); *Mellin v. Northern Security Insurance Company, Inc.*, 115 A.3d 799, 805 (N.H. 2015) (cat urine odor from neighboring apartment may constitute "direct

6

physical loss" if plaintiff could show "distinct and demonstrable alteration to the unit"); *Murray v. State Farm Fire & Casualty Co.*, 509 S.E.2d 1, 16-17 (W.Va. 1998) (landslide rendering homes uninhabitable, due to either actual physical damage or palpable future risk of physical damage from a follow-on landslide, was a "direct physical loss"); *Sentinel Management Co. v. New Hampshire Insurance Co.*, 563 N.W.2d 296, 300-01 (Minn. Ct. App. 1997) (asbestos contamination in building was "direct physical loss" when "property rendered useless").

In contrast, courts have rejected coverage when a business's closure was not due to direct physical harm to the insured premises.  In *Roundabout Theatre Co. v. Continental Casualty Co.*, the City of New York ordered the closure of a theater after a portion of a neighboring building under construction collapsed onto the street and adjacent buildings.  302 A.D.2d 1, 2-3 (N.Y. App. Div. 2002).  The theater itself sustained minor damage that was repaired in one day.  *Id.* at 3.  Nonetheless, the court found that the theater did not suffer a "direct physical loss" as a result of the city-mandated closure.  *Id.* at 7.  It found that "[t]he plain meaning of the words 'direct' and 'physical'" narrowed the scope of coverage and mandated "the conclusion that losses resulting from off-site property damage do not constitute covered perils under the policy."  *Id.*  Similarly, in *Newman Myers Kreines Gross, P.C. v. Great Northern Insurance Co.*, a federal district court found that a law firm did not suffer a "direct physical loss" when an electric utility preemptively shut off power in advance of Hurricane Sandy.  17 F. Supp. 3d 323 (S.D.N.Y. 2014).  The court distinguished the cases cited by the law firm (several of which were also cited by Plaintiffs in this case) as either "involv[ing] the closure of a building due to either a physical change for the worse in the premises … or a newly discovered risk to its physical integrity."  *Id.* at 330.  Citing *Roundabout*, the Court reasoned:

> The critical policy language here—"direct physical loss or damage"—similarly, and
> unambiguously, requires some form of actual, physical damage to the insured premises to

> trigger loss of business income and extra expense coverage.  Newman Myers simply cannot show any such loss or damage to the 40 Wall Street Building as a result of either (1) its inability to access its office from October 29 to November 3, 2012, or (2) Con Ed's decision to shut off the power to the Bowling Green network.  The words "direct" and "physical," which modify the phrase "loss or damage," ordinarily connote actual, demonstrable harm of some form to the premises itself, rather than forced closure of the premises for reasons exogenous to the premises themselves, or the adverse business consequences that flow from such closure.

*Id.* at 331; *see also United Airlines, Inc. v. Insurance Co. of State of Pa*., 385 F. Supp. 2d 343, 349 (S.D.N.Y. 2005), *aff'd* 439 F.3d 128 (2d Cir. 2006) ("The inclusion of the modifier 'physical' before 'damages' . . . supports [defendant's] position that physical damage is required before business interruption coverage is paid."); *Philadelphia Parking Auth. v. Federal Insurance Co.,* 385 F. Supp. 2d 280, 287-88 (S.D.N.Y. 2005) (noting that "'direct physical' modifies both loss and damage," and therefore "the interruption in business must be caused by some physical problem with the covered property . . . which must be caused by a 'covered cause of loss'").

While the Court can find no published cases in this jurisdiction analyzing the exact term "direct physical loss," cases addressing similar issues do not help Plaintiffs.  Most relevantly, in *Bros., Inc. v. Liberty Mutual Fire Insurance Co.*, the District of Columbia Court of Appeals considered whether a restaurant could recover on its claim after it lost business due to a curfew imposed by the D.C. government as a result of the riots following the assassination of Dr. Martin Luther King, Jr. in 1968.  268 A.2d 611 (D.C. 1970).  The insurance contract included this relevant language:

> In consideration of the premium for this coverage shown on the first page of this policy [Building and Contents] . . . the coverage of this policy is extended to include direct loss by . . . Riot . . . [and] Civil Commotion . . . .

> When this Endorsement is attached to a policy covering Business Interruption, . . . the term "direct," as applied to loss, means loss, as limited and conditioned in such policy, *resulting from direct loss to described property from perils insured against*; . . . .

8

*Id.* at 613 (emphasis in original).[1]   The Court of Appeals interpreted the term "direct loss" in the contract to mean "a loss proximately resulting from physical damage to the property or contents caused by a riot or civil commotion."  *Id.*  Under that definition, the Court found that the restaurant was unable to recover, since, "at the most," the restaurant's lost business due to the curfew "was an indirect, if not remote, loss resulting from riots" and there was no "physical damage to the property."  *Id.*  Accordingly, while the Court agrees with Plaintiffs that *Bros., Inc.* is not directly on point, the case does support the proposition that, in the context of property insurance, the term "direct loss" implies some form of direct physical change to the insured property.

With both dictionary definitions and the weight of case law supporting Defendant's interpretation of the term "direct physical loss," Plaintiffs' additional arguments are unconvincing.  First, Plaintiffs argue that because the insurance contract has specific exclusions for "loss of use" under some coverage lines but not for Income Protection coverage, the Court should infer that the Income Protection coverage covers losses such as Plaintiffs'.  Plaintiffs' Motion at 13-14.  But as already discussed, even if "loss of use" was covered, Plaintiffs would still have to show that the loss of use was a "direct physical loss" similar to those in the cases discussed *supra* at 5-7.  And for the reasons explained in this order, there was no "direct physical loss" to Plaintiffs.  Second, Plaintiffs argue that, unlike some similar insurance policies, their policies do not include a specific exclusion for pandemic-related losses.  *Id.* at 19-20.  But again,

---

[1] This Court notes that the phrase at issue in the *Bros., Inc.* contract was "direct loss," as opposed to "direct physical loss," at issue in the present case, and that in the *Bros., Inc.* case, there was an issue as to whether the "Building and Contents" Form, which was mistakenly attached to the policy at the time of signing, or the "Business Interruption" Form, which the insurance company later substituted, was construed by the trial court.  However, the Court of Appeals found it "unnecessary to ascertain which of the two forms was construed by the trial court," 268 A.2d at 612, as the Court found that the insurance company prevailed under both forms.

APP 020

even in the absence of such an exclusion, Plaintiffs would still be required to show a "direct physical loss."  Because they cannot do so, the Court grants summary judgment to Defendant.

Accordingly, it is this **6th** day of **August, 2020**, hereby

**ORDERED** that Plaintiffs' Motion for Summary Judgment is **DENIED**; and it is further

**ORDERED** that Defendant's Cross-Motion for Summary Judgment is **GRANTED**; and it is further

**ORDERED** that judgment is **ENTERED** in favor of Defendant Erie Insurance Exchange and against Plaintiffs, the initial scheduling conference is **VACATED**, and the case is **CLOSED**.

 

 

**Kelly A. Higashi**
Associate Judge
(Signed in Chambers)

**COPIES TO:**
David L. Feinberg
Michael C. Davis
George E. Reede, Jr.
Jessica Pak
*Via CaseFileXpress*

# EXHIBIT D

APP 022

k5e2SocH

```
1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    SOCIAL LIFE MAGAZINE, INC.,

4                    Plaintiff,              New York, N.Y.

5           v.                              20 Civ. 3311(VEC)

6    SENTINEL INSURANCE COMPANY
     LIMITED,
7
                    Defendant.
8
     ------------------------------x        Teleconference
9                                           Order to Show Cause

10
                                            May 14, 2020
11                                          10:00 a.m.

12   Before:

13                    HON. VALERIE E. CAPRONI,

14                                          District Judge

15


16                            APPEARANCES

17

18   GABRIEL J. FISCHBARG
          Attorney for Plaintiff
19

20   STEPTOE & JOHNSON, LLP
          Attorneys for Defendant
21   BY:  CHARLES A. MICHAEL
          SARAH D. GORDON
22

23

24

25
```

k5e2SocH

1          THE COURT:  Good morning, everybody.

2          Do I have a court reporter on the line?

3          THE COURT REPORTER:  Good morning, your Honor.

4    Kristen Carannante.

5          THE COURT:  Good morning.

6          Okay.  Do I have Mr. Fischbarg for the plaintiff?

7          MR. FISCHBARG:  Yes, Judge.  Hi.

8          THE COURT:  Mr. Fischbarg, is anyone else on the line

9    for the plaintiff?

10          MR. FISCHBARG:  Yes.  The plaintiff is on a separate

11   phone available if you need evidence or --

12          THE COURT:  The principal of Social Life?

13          MR. FISCHBARG:  Yes.  He is in my office, you know,

14   more than six feet away, and --

15          THE COURT:  Okay.

16          And who do I have for the defendant?

17          MR. MICHAEL:  Good morning, your Honor.  This is

18   Charles Michael, from Steptoe & Johnson, for the defendant.

19   With me is my partner Sarah Gordon, who was just admitted *pro*

20   *hac vice*, and who will be doing the presentation today.

21          THE COURT:  Terrific.

22          All right --

23          MS. GORDON:  Good morning, your Honor.

24          THE COURT:  Good morning.

25          Only people who are speaking need to note their

k5e2SocH

1    appearances, and I have got those, Mr. Fischbarg and

2    Ms. Gordon.  Everybody else, please mute your telephone.

3         Also, if you hear that sound that sounds like someone

4    has dropped off the line once we get started, I need you to

5    stop talking so that I can make sure that I have still got the

6    court reporter and your adversary on the line.

7         So, Mr. Fischbarg, this is your motion, so you get to

8    go first.

9         MR. FISCHBARG:  Yes.  So I submitted a reply

10   memorandum, you know, in the afternoon yesterday.  I was just

11   wondering if --

12        THE COURT:  Yes.  I saw that.  Thank you.

13        MR. FISCHBARG:  Okay, so you were also able to read

14   it, I suppose?

15        THE COURT:  Yes, yes.

16        MR. FISCHBARG:  Okay.

17        So I guess the only other thing I want to add that's

18   not in the papers, and then I don't know if your Honor has any

19   issues that you want to talk about, is I mentioned that Liberty

20   Mutual had this exclusion for viruses and it is also evident

21   that other insurance companies have the same exclusion,

22   including Travelers Insurance Company, and they filed the --

23   they actually filed a federal lawsuit for declaratory judgment

24   in California, Docket No. 20 Civ. 3619, to preempt such claims,

25   I guess to enforce their exclusion for viruses.  So to the

k5e2SocH

1  extent that the defendant is claiming some kind of overreach by

2  the plaintiff here, I don't think it is proper.  There are

3  several insurance companies who are capable of putting in a

4  virus exclusion in their policies, and in this case there is

5  none.  So --

6          THE COURT:  Let me ask you something.  First off, I

7  want to start with basics.  Do you agree that New York law

8  applies?

9          MR. FISCHBARG:  Yes.

10          THE COURT:  All right.  So the -- is it the *Roundabout*

11  *Theatre* case?

12          MS. GORDON:  Yes, your Honor.

13          THE COURT:  First Department case?

14          MS. GORDON:  Yes, your Honor.  This is Ms. Gordon on

15  behalf of Sentinel.

16          THE COURT:  Thank you.

17          Mr. Fischbarg, it would seem to me that the *Roundabout*

18  case is a real problem for your position.

19          Would you like to explain to me why it doesn't

20  preclude your claim?

21          MR. FISCHBARG:  Yes.  That case applies to off-site

22  property damage rendering the premises at issue inaccessible.

23  So in this case, you don't have off-site property damage.  You

24  have on-site property damage.

25          THE COURT:  What is the damage?  There is no damage to

k5e2SocH

1    your property.

2          MR. FISCHBARG:  Well, the virus exists everywhere.

3          THE COURT:  It damages lungs.  It doesn't damage

4    printing presses.

5          MR. FISCHBARG:  Right.  Well, that's a different

6    issue, whether or not -- that's a different issue than the

7    *Roundabout* case that had to do with accessibility.  Now we are

8    jumping to the topic of whether a virus can cause physical

9    damage to a printing press, as your Honor mentioned.  So that's

10   a separate issue, and there are a lot of cases that we have

11   cited where this type of material, a virus, does cause physical

12   damage.

13         THE COURT:  What's your best case?  What do you think

14   is your best case under New York law?

15         MR. FISCHBARG:  Well, the problem is, under New York

16   law, there isn't much law.  The New Jersey federal court, in

17   *TRAVCO*, citing other cases, including from other circuits,

18   where physical damage had a broader interpretation that

19   includes loss of use and not just, you know, something where

20   you take a hammer and break an item.

21         THE COURT:  With loss of use, I mean, loss of use from

22   things like mold is different from you not being able to,

23   quote, use your premises because there is a virus that is

24   running amuck in the community.

25         MR. FISCHBARG:  Okay.  I would disagree with that.  I

k5e2SocH

1    would say virus and mold are equivalent.  They are both

2    physical items which, if they land on a surface or are on a

3    surface, just like spores that are also listed in the policy,

4    mold is also listed in the policy.  I would say that the virus,

5    mold spores --

6            THE COURT:  Hang on --

7            MR. FISCHBARG:  -- anything --

8            THE COURT:  A second.

9            Do I still have the court reporter?

10           THE COURT REPORTER:  Yes, your Honor.

11           THE COURT:  Do I have I still have, Ms. Gordon?

12           MS. GORDON:  Yes, your Honor.

13           THE COURT:  All right.  Go ahead.

14           MR. FISCHBARG:  Mold spores, bacteria, virus, all

15   those are physical items which damage whatever they are on,

16   whatever they land on.  And in this case, the virus, when it

17   lands on something and you touch it, you could die from it.

18   So --

19           THE COURT:  That damages you.  It doesn't damage the

20   property.

21           MR. FISCHBARG:  But you are not able to use the

22   property because it damages you.  So it's a corollary.  In

23   other words, this policy, by the way, mentions the word "virus"

24   and "bacteria" in it in two places.

25           THE COURT:  Where does it mention it?

k5e2SocH

1        MR. FISCHBARG:  It mentions it in the PDF as well as

2   Exhibit 9, page 36 and 37, which is page 7 of 25 of the special

3   property coverage form under additional coverages, section

4   5(j), where the insured would cover certain law enforcement

5   orders requiring you to -- requiring remediation.  But it

6   contains an exclusion for bacteria and viruses, and it uses the

7   word "bacteria" and it uses the word "virus."

8        So what this is really referring to is the *Legionella*

9   bacteria, which is causes Legionnaires' disease typically.

10  That's the bacteria.  Virus is obviously something else.  So

11  this is obviously referring to when there is a Legionnaires'

12  outbreak in a building, which could happen in New York pretty

13  often, every few years, and then the building gets shut down

14  and they have to do remediation.  Either they -- at least as a

15  bacteria*, Legionella* bacteria only occurs in water or pipes or

16  in mist.  So the building is shut down, and then you might have

17  to -- and now there is a new code where the buildings have to

18  test their cooling systems for *Legionella* bacteria.  So that's

19  an example where a bacteria causes property loss, or loss of

20  use, or damage, physical damage to property.  And I would say

21  the virus is equivalent to that bacteria.  So --

22       THE COURT:  But it's not.  This is different.  The

23  virus is not specifically in your property that is causing

24  damage.  It is everywhere.  The Legionnaire example is very

25  different.  Because it's not like Legionnaire is running

k5e2SocH

1    rampant throughout the city, and therefore your office building

2    can get closed.  It is that the Legionnaire bacteria is in that

3    building causing --

4              MR. FISCHBARG:  Yes.

5              THE COURT:  -- that building to be shut down.

6              MR. FISCHBARG:  Yes.  Yes.

7              So this virus is everywhere, including this office in

8    particular, this office.  In other words, they just did a

9    random survey of people going into a grocery store in New York,

10   and 20 percent tested positive.  So, Judge, that's just a

11   one-sample test.  So if the infection rate in New York City is

12   20 percent, then the virus is literally everywhere.  So if

13   it --

14             THE COURT:  That's what --

15             MR. FISCHBARG:  -- is --

16             THE COURT:  That is what has caused the damage is that

17   the governor has said you need to stay home.  It is not that

18   there is any particular damage to your specific property.

19             MR. FISCHBARG:  Well, okay, that's --

20             THE COURT:  You may not even have the virus in your

21   property.

22             MR. FISCHBARG:  Well, okay, that's -- I would

23   disagree.  The virus not just causes -- it lands on equipment,

24   it lands everywhere.  That's why all of these -- all of the

25   health guidelines from the World Health Organization and

k5e2SocH

1    elsewhere talk about wearing gloves, talk about wiping things

2    down, because it lands on surfaces.  It doesn't just get

3    transmitted through the air.  Another way of getting it is

4    through contact --

5              THE COURT:  Right, but what --

6              MR. FISCHBARG:  -- when it touches your --

7              THE COURT:  What evidence do you have that your

8    premises are infected with the COVID bug.

9              MR. FISCHBARG:  Well, the plaintiff is here.  He got

10   COVID.  So that's evidence there.

11             THE COURT:  Well, it's not evidence that he got it in

12   his office.

13             MR. FISCHBARG:  Yes, but, okay, it's not -- we're

14   not -- I don't know what burden of proof we are looking at,

15   whether it is beyond a reasonable doubt --

16             THE COURT:  No, it's --

17             MR. FISCHBARG:  -- or more likely than not, more

18   likely than not, he can testify where he was and more likely

19   than not he either got it from his office or he got it from his

20   home.  So that's a different burden of proof.  If you are

21   looking for some kind of burden of proof to show that he got it

22   from his office, I mean, that's an evidentiary question, and we

23   can get an epidemiologist to testify and get an expert to

24   testify on that, which I understand is going to happen in the

25   other lawsuits that have been filed across the country

k5e2SocH

1    regarding --

2              THE COURT:  Okay.

3              MR. FISCHBARG:  -- this issue.

4              THE COURT:  Okay.

5              MR. FISCHBARG:  So . . .

6              THE COURT:  Anything further, Mr. Fischbarg?

7              MR. FISCHBARG:  No, I guess that's all for now.  Thank

8    you.

9              THE COURT:  Okay.  Thanks.

10             Ms. Gordon.

11             MS. GORDON:  Thank you, your Honor.  This is Sarah

12   Gordon on behalf of Sentinel, and we agree with your Honor's

13   thoughts here.

14             The property policy has two distinct requirements

15   here.  There has to be direct physical loss or physical damage

16   to the property and the cause of the business interruption

17   damages they are seeking has to be direct physical loss or

18   damage, and the cause here is not physical damage.

19             We think, you know, as your Honor rightly pointed out,

20   *Roundabout* controls.  It is under New York law.  It's a First

21   Department case from 2002.  There are no subsequent decisions

22   that have disagreed or overturned it here in New York; and, if

23   anything, it has been confirmed by this . . .

24             THE COURT:  Hang on.  Did I lose my court reporter?

25             THE COURT REPORTER:  No, Judge.  I'm here.

k5e2SocH

1          THE COURT:  Did I lose Mr. Fischbarg?

2          MR. FISCHBARG:  No, I'm here.

3          THE COURT:  Okay.

4          MS. GORDON:  This court, your Honor, in *Newman Myers*,

5    adopted the exact same rationale for a law firm that was trying

6    to assert damages where there were no -- business interruption

7    damages, where there was no physical harm to the property.

8    And, you know --

9          THE COURT:  Let me interrupt you for a second.

10         So Judge Engelmayer in *Newman* went out of his way to

11   talk about a case where there was a bunch of -- there was a

12   rock slide which didn't actually hit the house or the premises,

13   and yet they got coverage and coverage for the invasion of

14   fumes.

15         MS. GORDON:  Yes, your Honor.

16         So for most of the cases, there are a number of them,

17   there is -- what has happened is something physically has

18   happened to the property that prevents people from being on the

19   property.  So, for example, in *Gregory Packaging*, in New

20   Jersey, there was ammonia leaked out and they couldn't be on

21   the property, so something physically happened.  You couldn't

22   necessarily see it or touch it, but there were fumes and it was

23   unsafe to be there.  The same thing with *Motorists*, where there

24   was *E. coli* in the well.  You couldn't be in that house because

25   you were exposed to other things that had the *E. coli*.

k5e2SocH

1          The property has to be entirely unusable or

2     uninhabitable for physical loss or damage to constitute a loss

3     of use.  We don't think that's the law in New York in any

4     circumstance, but even in those other cases, there is nothing

5     equivalent here.  Mr. Fischbarg's client can go to his

6     premises.  There is no ammonia or mold or anything in the air

7     that's not going to allow him on to the property.  In fact, the

8     governor's orders explicitly allow him to go to the property

9     and get his mail or do routine business functions.  The only

10    rule is that he has to stay six feet apart from other people.

11    So those cases are entirely distinguishable.

12          And when a business, a property is allowed to remain

13    open or people can still occupy the premises, there is no

14    direct physical loss or damage.  That was the case -- that's

15    what the court said in *Port Authority*, that's what happened in

16    *Mama Jo's*, where the restaurant was allowed to be open.  The

17    cases where there is direct physical loss or damage, you

18    literally cannot be on the premises because there is something

19    there that is making it uninhabitable, and here that just isn't

20    true.

21          THE COURT:  Okay.  Mr. Fischbarg I will give you the

22    last word.

23          MR. FISCHBARG:  All right.  So I would disagree that

24    he is allowed to go to the premises.  In fact, the opposite is

25    true.  The executive order 202.8 says it requires 100 percent

k5e2SocH

1   reduction.  So he can't go there, and he is not allowed to go

2   there, and that is a separate claim.  It is the civil authority

3   claim besides the breach of contract claim.

4          THE COURT:  Doesn't the executive order say -- I'm

5   sorry, which executive order are you talking about?

6          MR. FISCHBARG:  It is . . .

7          It is Exhibit 3 of the declaration, and then on page

8   2, "Each employer shall reduce the in-person workforce at any

9   work locations by 100 percent no later than March 22 at 8p.m."

10  And then it says --

11         THE COURT:  Right, but that doesn't mean the boss

12  can't go to the work location.

13         MR. FISCHBARG:  I would say he is -- he is an employee

14  and he can't go.  I think it does.  In my building here in New

15  York, there is nobody here.  I'm the only one.  There is no

16  bosses in any of the offices.

17         THE COURT:  There is nothing about the governor's

18  order that prohibits a small businessperson or a big

19  businessperson from going into their office to pick up mail, to

20  water the plants, to do anything like --

21         MR. FISCHBARG:  Your Honor --

22         THE COURT:  -- that, including employees that are

23  working.

24         MR. FISCHBARG:  Sorry.

25         MS. GORDON:  Your Honor, this is Sarah Gordon.  Oh, go

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**APP 035**

k5e2SocH

1    ahead, Mr. Fischbarg.

2              MR. FISCHBARG:  Okay.

3              Again, I would disagree.  I think the order is pretty

4    clear that 100 percent means that you are not supposed to go to

5    work, and that's what people have been doing in New York.  They

6    are not going into the office.  And to the extent they are

7    getting mail, I mean, there is work-arounds where the workers

8    in the building have been leaving it downstairs for people to

9    pick up, but the way it's been implemented is that 100 percent

10   means no one is going to any office.

11             THE COURT:  You are in your office.

12             MR. FISCHBARG:  Yeah, I'm not -- I'm considered, by

13   the way -- lawyers are considered essential, and if you are a

14   sole practitioner, you are considered essential.  So I have the

15   exclusion, and that's why I am here, but otherwise I wouldn't

16   be here.  So . . .

17             MS. GORDON:  Your Honor, if I may?  We submitted with

18   Mr. Michael's affidavit, Exhibit D, a printout from the Empire

19   State Development website.  And on question 13, it addresses

20   exactly this issue.  It says, "What if my business is not

21   essential but a person must pick up mail or perform a similar

22   routine function each day?"  And the answer provided by the

23   Empire State is, "A single person attending a nonessential

24   closed business temporarily to perform a specific task is

25   permitted so long as they will not be in contact with other

k5e2SocH

1  people."

2           THE COURT:  I thought I had read that somewhere.

3           MS. GORDON:  Yes.  It is in Mr. Michael's declaration,

4  and I think it's ECF 18-4, page 304.

5           THE COURT:  Okay.

6           MR. FISCHBARG:  Right, but I think the executive order

7  supersedes that is what I would argue.

8           THE COURT:  Okay.

9           Mr. Fischbarg, you have got to demonstrate a

10  probability of success on the merits.  I feel bad for your

11  client.  I feel bad for every small business that is having

12  difficulties during this period of time.  But New York law is

13  clear that this kind of business interruption needs some damage

14  to the property to prohibit you from going.  You get an A for

15  effort, you get a gold star for creativity, but this is just

16  not what's covered under these insurance policies.

17           So I will have a more complete order later, but your

18  motion for preliminary injunction is going to be denied.

19           Anything further for the plaintiff?

20           MR. FISCHBARG:  I guess just a housekeeping thing.  We

21  filed an amended complaint.  Are we going to deem it served or

22  does it have to be re-served?

23           THE COURT:  Has the defendant -- does the defendant

24  want to be reserved or will you take the amended complaint?

25           MR. MICHAEL:  Your Honor, this is Charles Michael.

k5e2SocH

1              We have entered a notice of appearance, and so I think

2    once they filed it on ECF, that service, we are happy to

3    consider it served.  That's fine.  And he does have one

4    amendment as of right.

5              THE COURT:  Correct.

6              MR. MICHAEL:  That was within his right to file it.

7              THE COURT:  Does defendant plan to move or answer?

8              MR. MICHAEL:  Probably to move.  We would have to

9    discuss it with our client, but I believe so.

10             THE COURT:  Okay.  What are the parties' position on

11   discovery while the motion to dismiss is pending?

12             MR. FISCHBARG:  Well, I would say there are two

13   motions filed -- there is one in the Eastern District of

14   Pennsylvania and one in, I think, the Northern District of

15   Illinois -- for an MDL, multi-district litigation, involving a

16   lot of lawsuits combining, so I think this might be happening

17   in each state until that motion is decided, and I think the

18   briefing schedule is in June --

19             MS. GORDON:  We -- your Honor --

20             MR. FISCHBARG:  -- so I think --

21             MS. GORDON:  Sorry, Mr. Fischbarg.

22             MR. FISCHBARG:  So I would say that this case might be

23   transferred to the multi-district panel at some point.

24             THE COURT:  Okay.  So, Mr. Fischbarg, what I am

25   hearing you say is that you are perfectly happy to have the

k5e2SocH

1   defendants not move until we find out whether or not your case

2   is going to get scooped up into the MDL?

3            MR. FISCHBARG:  Yes, correct.

4            THE COURT:  All right.  I presume that the defendants

5   are perfectly happy to do nothing until you hear back from the

6   MDL.

7            MS. GORDON:  Your Honor, I need to consult with my

8   client on that.  I'm not sure that that's true.  We don't think

9   these cases are appropriate for consolidation in the MDL for

10  many of the reasons which were evident today, given the

11  different states' conclusions on these laws.  So I need to

12  consult with my client on the motion practice.  We may intend

13  to want to move in any event.

14           THE COURT:  Okay.  Well, you could move, but if there

15  is a likely -- if there is some likelihood that they are going

16  to get scooped into the MDL, I'm not likely to decide it until

17  that decision is made.  So it is entirely -- I guess from my

18  perspective I don't really care, but from your client's

19  perspective, they may be making a motion to dismiss that's

20  unnecessary.  If you are right, and you may well be right, that

21  they are not going to MDL these kinds of cases, then all that's

22  happening is this is just being delayed into the summer for you

23  to incur fees making a motion to dismiss.

24           So why don't you talk to your client, figure out what

25  you want to do.  One way or the other, it does not seem to me

k5e2SocH

1    to make sense to proceed with discovery in this matter,

2    certainly under the circumstances that everyone is in, and

3    particularly the plaintiff is in, strapped for revenue, until

4    we figure out whether a lawsuit is going to go forward.

5           So talk to your client, figure out whether -- the

6    defendant should talk to Sentinel.  Figure out whether you are

7    happy staying this case pending a decision on the MDL or not,

8    and just write me a letter and let me know.

9           MS. GORDON:  Yes, your Honor.  Thank you.

10          MR. MICHAEL:  Your Honor --

11          THE COURT:  Anything further from the plaintiff?

12          MR. MICHAEL:  Just one housekeeping matter.  This is

13   Charles Michael, again, for the defendant.

14          THE COURT:  Okay.

15          MR. MICHAEL:  I just wondered if there was any special

16   procedures for ordering the transcript or if we go just through

17   the normal Southern District website?  I didn't know, under the

18   COVID circumstances, if there is something different we should

19   do.

20          THE COURT:  I don't think there is anything different,

21   but we have got the court reporter on.

22          So, Madam Court Reporter, is there anything different

23   they need to do?

24          THE COURT REPORTER:  At the end of this proceeding, I

25   am going to email the parties with their instructions.

k5e2SocH

1            THE COURT:  Okay.

2            MR. MICHAEL:  Terrific.  Thank you so much.

3            THE COURT:  Anything further from the plaintiff,

4    Mr. Fischbarg?

5            MR. FISCHBARG:  No.  Thank you, Judge.

6            THE COURT:  Anything further from the insurance

7    company?  Ms. Gordon?

8            MS. GORDON:  No.  Thank you, your Honor.

9            THE COURT:  All right.  Thank you, all.

10           MR. FISCHBARG:  Okay.  Bye, Judge.

11           MR. MICHAEL:  Thank you, your Honor.

12                              oOo

13

14

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT E

APP 042

```
 1                        STATE OF MICHIGAN

 2            IN THE CIRCUIT COURT FOR THE COUNTY OF INGHAM

 3    _____
 4   GAVRILIDES MANAGEMENT COMPANY,
 5                        Plaintiff,
 6   vs.                                      File No. 20-258-CB
 7
 8   MICHIGAN INSURANCE COMPANY,
 9            Defendant.
10   _____/

11
12            DEFENDANTS MOTION FOR SUMMARY DISPOSITION
13      BEFORE THE HONORABLE JOYCE DRAGANCHUK, CIRCUIT COURT JUDGE
14            LANSING, MICHIGAN - WEDNESDAY, JULY 01, 2020
15
16

17   APPEARANCES:
18   For the Plaintiff:          Matthew J. Heos-P73786
19                               3452 East Lake Lansing Road
20                               East Lansing, Michigan 48823
21                               517-256-4240
22
23
24   For the Defendant:          Henry Emrich-P29948
25                               2025 East Beltline Avenue SE-#600
26                               Grand Rapids, Michigan 49546
27                               616-285-0143
28
29
30   Recorded/transcribed by:    Susan C. Melton, CER 7548
31                               Certified Electronic Reporter
32                               (517) 483-6500 x6703
33
34
35
36
37
38
39
40
41
42
43
44
```

1

TABLE OF CONTENTS

2

3

4  WITNESSES                                    PAGE

5  None.

6

7

8

9  EXHIBITS

10 None admitted.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

2

APP 044

1               Lansing, Michigan

2               Wednesday, July 01, 2020

3               2:58:57 PM

4               THE COURT: This is, pardon me if I massacre

5       this, Gavri--, Gavrilides Management Company, et al versus

6       Michigan Insurance Company, docket number 20-258-CB. And

7       this is the time set for Defendant Michigan Insurance

8       Company's Motion for Summary Disposition. And just for the

9       record, could I have your appearances, please?

10              MR. HEOS: Yes, your Honor. Matthew Heos and Nick

11      Gavrilides is here in the courtroom also with me. He is

12      the owner of the immediate plaintiff company's.

13              MR EMRICH: Henry Emrich on behalf of Michigan

14      Insurance Company, your Honor and my assistant Chenney

15      Ward.

16              THE COURT: Okay, thank you. And your motion, Mr.

17      Emrich, if you wish to go ahead.

18              MR. EMRICH: Thank you, your Honor. I am going to

19      assume that the Court has read all of the pleadings in

20      this case, so I'll try not to belabor some of the points.

21      I think the, the key fact that we need to focus on is that

22      as we've argued is that there's no question here but the

23      policies that insure Mr. Gavrilides properties against,

24      against direct physical loss or damage to the property and

25      contrary, any claim with the policy benefits in question

3

1    this business income coverage is illusory, the policy in

2    question here clearly provides that for the business

3    coverage, the business income coverage to apply and, and

4    most of the other primary coverages under their policy,

5    there must be a direct physical loss of or damage to the

6    insured property in order for it to apply.

7           And I think it's important as we'll discuss

8    later in our argument depending on what Mr. Heos has to

9    say, why this is important, we must focus on the fact that

10   there must be direct physical loss or damage to the

11   insured property and not direct physical loss of use of or

12   damage to the property as has been suggested by Mr.

13   Gavrilides and his attorney in order for the coverage at

14   issue to apply.

15          While I acknowledge, your Honor, that this is a

16   somewhat unique, extraordinary if you will, matter to be

17   filing at this point in the proceedings as our initial

18   pleading; I think it's important to understand that when

19   we look at Mr. Gavrilides complaint, it does not contain

20   one single allegation that this insured property has in

21   any way been damaged or lost.  To the contrary, the

22   allegations in the complaint affirmatively allege that the

23   plaintiff business interruption claim is based on the

24   "Stay at Home" orders of Governor Whitmer. There is no

25   allegation of any kind that the property in question has

4

1    in any way been damaged, lost or anything of the sort.

2            Given that this motion has been brought under

3    2.116(c)(10), plaintiff must produce some evidence to

4    contradict the uncontroverted facts that have been alleged

5    not only in the complaint, but in the affidavit submitted

6    Mr. Gavrilides and in any of the other materials that Mr.

7    Heos has attached to his response as, as indicated, most

8    importantly, the affidavit of Mr. Gavrilides that

9    reiterates the admissions in the complaint that there has

10   not been any loss of or damage to either of the properties

11   for which they seek coverage.

12           The insureds property today exists in the very

13   same condition as it existed the day prior to the

14   effective date of the "Stay at Home" order.  They have not

15   been lost, they have not been damaged, they have not

16   required any repairs because of any damage to those

17   properties. The business operation, its, its operation as

18   a restaurant today is, is the same as the day prior to the

19   effective date of the order, albeit with some modifi-

20   cations that had been required to avoid grouping and to

21   maintain social distancing in, in a sense improvements to

22   the real estate.  Not repairs, you know, and, and it's

23   been maintained as a take-out, take-out operation at least

24   until recently when they resumed the dining operation.

25   There has been no loss of or damage to either building

5

1        that has prevented the plaintiff from operating as a

2        restaurant or entering it for that matter if--, as they

3        have. If plaintiffs wanted to sell either building today,

4        they could do so. And while plaintiffs have provided some

5        speculative evidence about the decreased value of that

6        property, although, as I read Mr.--, as I read the

7        materials that Mr. Heos kindly attached to his response,

8        the fact of the matter is it pointed out in that article

9        was that while they operation of a commercial property may

10       get harder, it's not impossible to operate it in the

11       future under our new normal.

12            Because plaintiffs complaint, the affidavit, the

13       other information that has been provided to your Honor

14       provides no evidence of any damage to that property.

15       Plaintiffs could never prove that either property suffered

16       any direct physical loss from the imposition of Governor

17       Whitmer's emergency order.  And thus, could never recover

18       business interruption coverage under this policy based on

19       the facts that have been presented to the Court. The same

20       holds true under the business cover, income coverage, if a

21       civil authority prevents or prohibits access to either

22       property because of direct physical damage to an adjacent

23       or nearby property for the very same reason.  There has

24       been no direct physical loss or damage to any adjacent

25       property that has been alleged, that has been provided to

6

1       the Court in Mr. Heos response. And frankly, when you look

2       at the order that they have, that is at issue in this

3       case, there's nothing there that prevents access to Mr.

4       Gavrilides properties whatsoever.

5                    In summary, your Honor, there are no facts

6       alleged in the complaint or in any of the materials that

7       I've looked at, including Mr. Gavrilides affidavit, that

8       shows there has been direct physical loss of or damage to

9       the insured property. And for those reasons, your Honor,

10      we believe that our motion--, for those reasons alone, we

11      believe our motion for summary disposition should be

12      granted.

13                   I'd just like to make a couple of additional

14      points before I shut up.  I really believe summary

15      disposition is warranted on this basis alone and I would

16      turn the Court to the case that we've discussed in our, in

17      our brief, your Honor, that's referred to Universal

18      Insurance Production versus Chubb. And that's the decision

19      of the Eastern District of Michigan involving a claim that

20      involved insured property.  It was damaged by a pervasive

21      odor that developed in the property as a result of mold

22      that grew in the property because of some water seepage.

23      And why that case is important is because it discusses the

24      Michigan Rules of Contract Interpretation, that still

25      apply today, policy language is clear and unambiguous on

7

1     its face, which we believe is clearly the case here that

2     states that the words and the terms of the policy should

3     be enforced utilizing plain and commonly understood

4     meanings.

5           And when I said earlier that that's important

6     when we talk about what direct physical loss of or damage

7     to property means, it means we look at those words. We

8     don't add words such as loss of use, that Mr. Heos and Mr.

9     Gavrilides have added in order to understand what we're

10    talking about here. We look at the language in the policy.

11    Every case that Mr. Heos produced your Honor, says the

12    very same thing. In Univer--, Universal, like here, the

13    policy was an 'all-risk' policy that required, like here,

14    direct physical loss or damage to the insured property in

15    order to trigger coverage unless that coverage was

16    excluded.

17          As Universal pointed out, applying a dictionary

18    meaning of direct and physical as meaning something

19    immediate or proximate as a premise to something that is

20    distant or incidental and physical meaning something that

21    has a material existence meant in the context of a loss

22    involving a contaminant that, unlike here, per the  uncon-

23    troverted allegations of the complaint and other evidence

24    produced by plaintiff in response to this motion. That in

25    order for direct physical loss of the property in this

8

1    context, the contaminant must actually alter the structure

2    integrity of the property in order to trigger coverage

3    under language that is at issue in this case. And it

4    didn't happen in Universal, as the Court denied coverage

5    there, granted affirmed summary disposition. And

6    importantly your Honor, it hasn't even been alleged in

7    this case. Regardless of any authority to the contrary,

8    anywhere else in the country, this remains the law in our

9    courts when interpreting policy terms at issue. There is a

10   requirement that there be direct physical loss of or

11   damage to property. And the allegations produced here in

12   the complaint and the evidence that's been attached have

13   specifically acknowledged no such contamination and no

14   such damage to the property as a result of that contami-

15   nation.

16           As in Universal, your Honor, the mere presence

17   of odor or even mold was not any evidence of structural or

18   tangible damage to the insured property. And as such, no

19   direct physical loss or damage to the property had-, was

20   occurred. Here, your Honor, we have the very same thing

21   except that we have not even had any allegations of any

22   damage to the property caused by this unfortunate, this

23   horrible virus.

24           Finally, and although we do not believe the

25   Court even has to get to this point, even if we assume for

9

1    purposes of this motion that contamination occurred on

2    each premises and that somehow effected the structural

3    integrity of either building, again, neither scenario is

4    alleged. And even if it were, we do not believe under the

5    circumstances and the science that exists that it would

6    necessarily constitute direct physical loss over damage to

7    the property. The buyer's exclusion of the policy, which

8    clearly and unequivocally states that it applies to all

9    coverages and endorsement and that the company will not

10   pay for loss or damages caused by or resulting from any

11   virus, bacteria or other microorganism that induces or is,

12   is capable of inducing physical distress, illness or

13   disease. And Lord knows, that that has certainly been the

14   case with what's happened with Covid-19 throughout our

15   country.

16          Clearly, your Honor, that exclusion, again, I

17   don't believe you even have to get there, but that

18   exclusion would clearly exclude any claim here even if

19   plaintiff's could prove direct physical loss of or damage

20   to the insured property or any nearby property that

21   resulted in a civil authority issuing an order prohibiting

22   access to the property.  As of eight days ago, your Honor,

23   they have only been few jurisdictions in this country,

24   Florida and Pennsylvania, that have discussed and applied

25   this, a similar exclusion as at issue in this case and in

10

1   every one of those cases, the Court has enforced that

2   exclusion as written because it's clear and unambiguous.

3   Again, your Honor, for all the reasons that we've set

4   forth here today and the brief that we filed and our

5   reply, we request that the Court grant our Motion for

6   Summary Disposition at this time. Thank you.

7            THE COURT:  Thank you. Mr. Heos?

8            MR. HEOS: Thank you, your Honor and may it

9   please the Court. And obviously Mr. Emrich and I have a

10  different interpretation of direct physical loss of or

11  damage to covered properties because here the loss comes

12  from the issue of the executive order restricting use of

13  property. Physically you cannot use for, for dine-in

14  services any of the interior of the building for a period

15  of time. And a complete prohibition isn't contemplated by

16  the language of the contract, I think a limited

17  restriction also falls within the coverage. And I think

18  that if you're gonna accept the defendants argument you

19  would have to limit the meaning to destruction of the

20  physical building itself, but we know that the coverage

21  extends to non-destructive loss, civil authority being

22  one.

23            I put in example in the brief subterranean

24  pollution, you can look at asbestos or a computer virus is

25  something that would occur that there would be no physical

11

1        destruction to the property itself. The fact of the matter

2        is that Mr. Gavrilides can't use the covered properties

3        because of or he's lost rather the use of those properties

4        because of the order and it looks like that will continue

5        in some form for a while. So, I think that counsel is

6        wrong in trying to limit the scope even with the case law

7        he cited, most of which is persuasive and not binding.

8        That's number one, Judge.

9                    And as for the virus exclusion itself, the only

10       case law we have relates to person to person transmission

11       of a virus at the covered property.  And I think that fits

12       more with what's going on. We see in the news that Harpers

13       in East Lansing and even the Hotcat in Kalamazoo is making

14       headlines of people contracting Covid there. But, the

15       impetus of the order was to protect public health and

16       welfare, which is the governor's duty. It's not caused by

17       a virus. It would be the same order as with the damn in

18       Midland being issued to protect public health and welfare.

19       It wasn't caused by a flood.  It was caused by the

20       Governor's duty to act and protect the people she's

21       charged with protecting and I think that's what happening.

22                   Or it's distinguishable from the case and I

23       think it's Bowler, the case cited regarding the virus. And

24       I think that if you go further in accepting defendant's

25       position, then we get into the illusory promise of well if

12

1      the government issues an order, we're not gonna cover it

2      because any decision of a government body or group of

3      people is excluded. And so then, you get into the circle

4      in the contract where if you're going to buy into counsels

5      logic, it would make that provision illusory. And for

6      those reasons, I think that the motion should actually

7      roll back on the defendants because the language to

8      support the claim, to the extent that the Court thinks

9      there's a deficiency in my pleading and is gonna grant

10     defendants motion, I'd like Leave to Amend the Complaint.

11     But, I don't think that's the case here. And with that,

12     I'll leave it, if the Court would like to ask any

13     questions, I'm happy to take them.

14              THE COURT: I don't have any. Thank you. I'll

15     give Mr. Emrich rebuttal time.

16              MR. EMRICH: Thank you, your Honor. Your Honor,

17     what I would say is that when we talk about these cases

18     that Mr. Heos has mentioned that might provide coverage in

19     certain situations, I read those cases a little while ago

20     and I'm kind of tired reading some of these cases about

21     insurance coverage. But, the point in every one of those

22     cases is that the condition she referred to actually

23     caused damage to the property.

24              In this case, there has not been any such

25     damage. And if we look at what the coverage for business

13

1    loss or business--, the business income loss that they're

2    seeking says, it says that if the business, the coverage

3    would apply if the business operation is suspended

4    provided the suspension must be caused by the direct

5    physical loss of or damage to property. In this case, that

6    hasn't occurred. Nothing prevents Mr. Gavrilides from

7    using that property. It has been used as such. The fact

8    that there may be other coverages that may provide some

9    limited coverage, they're against what Mr. Heos is arguing

10   because clearly, if those coverages were covered under

11   this language, then why have a special coverage that

12   provides certain conditions for its application.

13            The point is, in each of those civil authority

14   cases that he talked about, the property actually

15   sustained damage. Here it didn't sustain damage. As to his

16   claim in this case, that he wants an opportunity to amend

17   his complaint if the Court feels compelled to grant my

18   motion, what is that going to accomplish? He's already

19   alleged in his complaint and his client has already signed

20   an affidavit where he no doubt put his hand up and swore

21   to the contents of that affidavit in which he said there

22   has been no damage to that property.

23            We don't create coverage by-, because somebody

24   thinks they ought to have coverage. But, that, that, that

25   whole line of cases Roy versus Continental Insurance and

14

1    some of the other cases in our, in our brief that we

2    cited, clearly supports the notion that the reasonable

3    expectation concept doesn't apply in Michigan. It just

4    doesn't cut it. There is no coverage here, your Honor.

5    That exclusion is clear. If the Court feels that there may

6    be or that there may be a situation that would give rise

7    to, but again, you have to come forward at the time that

8    you, that you respond to this motion with some evidence

9    that suggests that. That hasn't happened here. I mean even

10   when you look at the response that he's filed, he talks

11   about scenario's that have absolutely no bearing to this

12   case.

13             And you know, I'll just make one last point,

14   your Honor, you know, when I was a young Prosecutor, I had

15   the benefit of being able to argue a number of cases to

16   juries that required me to prove the defendant's guilt

17   beyond a reasonable doubt. And in those cases, I was

18   trained to listen closely to the defendant's argument and

19   had been the case where the facts were particularly

20   egregious, a defense attorney would often not even talk

21   about those facts and talk about the law. And he talked

22   about how that law was somehow created this reasonable

23   doubt in hopes of creating some confusion on the part of

24   one juror who might then find in his clients favor because

25   reasonable doubt existed. And, and in those cases, I would

15

1     make sure that when I got up in rebuttal, just as I have

2     been given the opportunity to here, I would point that out

3     to the jury and indicate to them that there's a reason for

4     that. And that's because they didn't want you to talk

5     about the facts that clearly supported conviction.

6              On the other hand, if it was a case where the

7     law, you know, or the facts may have been murky, but the

8     law was clear, the defense attorney would only focus on,

9     you know, on those facts and not talk about the law. And

10    again, I point that out to the jury there.  But, in this

11    case, you know, and there were cases back then to, like

12    our case here that were neither supported by the facts or

13    the law. Which I believe is clearly the case in this case.

14    And the defense attorney would get up and argue something

15    that to the jury that had absolutely nothing to do with

16    the case in hopes of confusing them. Just like Mr. Heos

17    has suggested by talking about these asbestos cases or

18    some of these other cases that have nothing to do with

19    this.

20              Well in this case, when you look at his

21    responsive pleading, he talks about an accident situation

22    that has absolutely no application here. Nothing to do

23    with this case. While in his argument, he starts out

24    talking about a discussion of the virus of racism and as

25    there, as there, we would point out, if we were in front

16

1    of a jury, just like I'd point out to them and I'm

2    pointing out to you, it hasn't got anything to do with

3    this case. Your Honor, the reason for that and the reason

4    for the topic of that is that he knows that neither the

5    facts or the law support his claim and nothing he could

6    file as an amendment would change that.

7    He is hoping to somehow create this little bit

8    of possibility, some scintilla that some evidence is gonna

9    pop up that shows that the property has been damaged in

10    hopes that he could trigger coverage. And as this Court

11    knows under the cases we've discussed in our brief, that

12    is not sufficient to deny summary disposition in a case

13    that clearly warrants it even at this early stage.

14    Thank you your Honor for your patience. Thank

15    you Mr. Heos, we've never met. I've heard a lot of good

16    things about you. Mr. Gavrilides, nice to have met you,

17    very sorry for the situation you're in. It's just crazy

18    all the way around. And just like having to argue this

19    case on TV is really just disconcerting for me. But, in

20    any event, thank you your Honor for your patience.

21    THE COURT: Thank you. You're on Youtube not TV.

22    But--

23    MR. EMRICH: I meant screen. Yeah, whatever.

24    THE COURT: Right.

25    MR. EMRICH: The screen.

17

1        THE COURT: I, I did read the briefs. I studied

2   them very carefully and I've listened to the argument of

3   counsel today. And taking all the-, that together I, I

4   note that the plaintiff speaks of and focuses on arguments

5   about access to the property, use of the property and

6   definitions of loss and damage. But, the first inquiry has

7   to start with a full look, not just isolating some words

8   or phrases from the policy. But, a full look at the

9   coverage that's provided under the policy.

10       Coverage is provided for actual loss of business

11  income sustained during a suspension of operations. The

12  policy goes on to provide the 'suspension must be caused

13  by direct physical loss of or damage to property.' And it

14  also provides 'the loss or damage must be caused by or

15  result from a covered cause of loss. The causes of loss

16  special form provides that a covered cause of loss means

17  risks of direct physical loss.'

18       So, whether we're talking about the cause for

19  the suspension of the business or the cause for the loss

20  or the damage, it is clear from the policy coverage

21  provision only direct physical loss is covered. Under

22  their common meanings and under federal case law as well,

23  that the plaintiff has cited that interprets this standard

24  form of insurance, direct physical loss of or damage to

25  the property has to be something with material existence.

18

1     Something that is tangible. Something according to the one

2     case that the plaintiff has cited from the Eastern

3     District, that alters the physical integrity of the

4     property.  The complaint here does not allege any physical

5     loss of or damage to the property. The complaint alleges a

6     loss of business due to executive orders shutting down the

7     restaurants for dining, for dining in the restaurant due

8     to the Covid-19 threat.

9     But, the complaint also states that a no time

10    has Covid-19 entered the Soup Spoon or the Bistro through

11    any employee or customer and in fact, states that it has

12    never been present in either location. So, there simply

13    are no allegations of direct physical loss of or damage to

14    either property. The plaintiff seems to make in the

15    briefing, at least, two arguments about the language in

16    the coverage provision and what it means.

17    The first argument is that the plaintiff says

18    coverage applies to "direct physical loss or damage to

19    property."  Even if that were the wording of the coverage

20    provision, it wouldn't save the plaintiff from the

21    requirement that the loss or damage must be physical and

22    the analysis could end right there. But, I have to go on

23    to say that this is not even the wording of the coverage

24    provision. Coverage according to the policy applies to a

25    suspension caused by "direct physical loss of or damage to

19

1     property." So, I'm not going to get into a detailed

2     analysis of the rules of grammar. But, common rules of

3     grammar would apply to make that phrase a short-cut way of

4     saying "direct physical loss of property or direct

5     physical damage to property." So, again, the plaintiff

6     just can't avoid the requirement that there has to be

7     something that physically alters the integrity of the

8     property. There has to be some tangible, i.e., physical

9     damage to the property.

10          Then the plaintiff in the briefing, at least,

11     seems to make a second argument that and this is not 100%

12     clear, but, it seems like the plaintiff is saying that the

13     physical requirement is met because people were physically

14     restricted from dine-in services. But, that argument is

15     just simply nonsense. And it comes nowhere close to

16     meeting the requirement that there's some, there has to be

17     some physical alteration to or physical damage or tangible

18     damage to the integrity of the building.

19          So, the next argument that the plaintiff makes

20     is that the virus and bacteria exclusion is vague and

21     can't apply here.  The plaintiff has not adequately

22     explained how the term virus is vague. And in fact,

23     supplies a completely workable, understandable, usable

24     definition of the word virus. The argument in this regard

25     really seems to be more that the virus exclusion doesn't

20

1  apply. And it goes something like this as far as I can
2  tell, first, a virus can't cause physical loss or damage
3  to property because virus' harm people, not property.
4  Second, the damage caused here was really caused by
5  actions of the civil authority to protect public health.
6  And then third, therefore, coverage for acts of any
7  person, group, organization or governmental body applies.
8  But, that argument bring us right back to the direct
9  physical loss or damage requirement.  Again, going back to
10  the cause of loss special form B, as in boy, exclusions
11  provides that acts of government are only covered when
12  they result in a covered cause of loss.  A covered cause
13  of loss, again, is direct physical loss. So, even if the
14  virus exclusion did not apply, which the plaintiff has not
15  supported that it doesn't apply, I only argue that it's
16  vague, which I reject. But, even if it did not apply, it
17  could only be coverage for governmental actions that
18  resulted in direct physical loss or damage.

19  And then, finally, the plaintiff argues that the
20  policy has a contradiction in it that renders it illusory.
21  So, the plaintiff says that the policy extends coverage
22  for governmental acts. But, then, it takes it away in the
23  causes of loss special form.  But, that's simply not true.
24  Coverage is provided for actual loss of business income
25  sustained during the suspension of operations.  However,

21

1       according to the coverage provision, the suspension must

2       be caused by direct physical loss of or damage to

3       property.  And governmental acts are likewise covered if

4       it results in a covered cause of loss, which is again, a

5       direct physical loss.  There is no granting of coverage

6       and then excluding the same coverage in the policy. As a

7       matter of fact, the policy is consistent throughout and

8       consistent with federal law cited by the plaintiff. It

9       requires physical loss or damage.

10              There is a virus exclusion even if plaintiff was

11      alleging, was alleging, even if there were allegations in

12      the complaint alleging actual physical loss or damage,

13      which the complaint does not do. But, there is a virus

14      exclusion that would also apply. And governmental action

15      that results in direct physical loss is covered. But

16      again, there is no direct physical loss alleged here.

17              Now, I have to address a little bit this, that

18      it was brought as a (c)(10) motion. The actually the

19      defendant hasn't provided any support by way of factual

20      support, depositions, affidavits, et cetera, for a (c)(10)

21      motion. So, if the defendant doesn't do that, then the

22      plaintiff has no burden under Maiden versus Rosewood. So,

23      there's no shifting burden until the moving party first

24      does it. But, I don't think it properly is labeled a

25      (c)(10) motion. I think it's a (c)(8) motion. Because this

22

1    is the motion that can be decided as a matter of law. Take
2    all the allegations in the complaint as true and examine
3    nothing more than the contract upon which the complaint is
4    based, the policy of insurance and as a matter of law, the
5    plaintiffs complaint cannot be sustained. And although the
6    plaintiff has requested a chance to amend without any
7    indication of how they would do that, there actually is no
8    factual development that could change the fact that the
9    complaint is complaining about the loss of access or use
10   of the premised due to executive orders and the Covid-19
11   virus crisis. So, there's no factual development that
12   could possibly change that or amendment to the complaint
13   that could possibly change that those things do not
14   constitute the direct physical damage or injury that's
15   required under the policy as I've outlined.

16            So, for those reasons, I am granting the
17   Defendant's Motion for Summary Disposition. I'm doing it
18   under MCR 2.116 (c)(8). And Mr.—

19            MR. EMRICH: Thank you, your Honor.
20            THE COURT: Mr. Emrich, will you submit an order?
21            MR. EMRICH: Certainly will, your Honor.
22            THE COURT: Okay.
23            MR. EMRICH: Thank you.
24            THE COURT: Thank you.
25            MR. HEOS: Thank you very much.

23

1         THE COURT: That will conclude our hearing.

2              (Hearing concludes at 3:32:35 PM.)

3

4

5

6

7

8

9

10      STATE OF MICHIGAN)

11                  )

12      COUNTY OF INGHAM)

13

14

15

16      I certify that that this transcript, consisting of 24

17  pages, is a complete, true, and correct transcript of the

18  proceedings and testimony taken in this case on Wednesday,

19  July 01, 2020.

20

21

22  July 09, 2020           _____

23                          Susan C. Melton-CER 7548
24                          30th Circuit Court
25                          313 West Kalamazoo Avenue
26                          Lansing, Michigan 48901
27                          517-483-6500 ext. 6703

28

24